We'll move on to the last case of the day, United States v. Bettye Kidd, Appeal No. 18-1532. Mr. Campion. Thank you, Your Honors, and good afternoon. May it please the Court. Bettye Kidd worked for Andis Clippers in Racine as an hourly employee in the shipping department for nearly two decades. She was, in the words of her employers, a trusted associate. Actually, Andis referred to all of their employees as associates. Andis is a family-run company, and they cultivate a family spirit at the plant among their employees. So, knowing that, it's a little easier to understand the grievous sense of harm, shock, and loss, when in 2017, Andis management realized that one of these family members had been methodically stealing from them week after week for years in over 1,400 separate incidents. Prior to the sentencing hearing, a lawyer for Andis described in a letter the impact on Andis of kids' crimes. He said they shook the company's, the entire organization's, sense of family and the owner's trust in their employees, their associates. For that, Bettye Kidd deserved to be prosecuted and punished, but she did not, because she did not fit the guidelines definition of occupying a position of trust, the court erred in so finding and in raising her. Mr. Campion, what's your theory of prejudice here? We've got a case where Ms. Kidd falls right in between the examples that are given in the application note, and she gets a below-guideline sentence even without the abuse of trust enhancement. This would seem to me to be a pretty classic case for harmless error. Well, respectfully, I practice in essentially, well, just one district, but I know my district. Our district sentences people below the guidelines more so than most any other district in the country. So going into it, I recommended a probation sentence. I realize that was a reach, but under all of 3553 factors, I believe that was at least possible. The sentence that we received wasn't shocking, and it was below guidelines, and as the court has said, below even the guideline I sought. But the guidelines certainly serve as an anchor for judges. I can't say how much of an anchor, but if this case is remanded, Judge Stattmiller will know that the enhancement was inapplicable, and I think the starting point may come down. There will be no facts will have changed. The victim's sense of breach of trust will be exactly the same. Everything Judge Stattmiller said would remain perfectly valid. It's simply that the guideline advice that he didn't follow before will change to slightly different advice. I don't disagree with much of that, but the court would have with it, if it was remanded, the sense that perhaps the court had conflated the notion of abusive trust, or simply a trust in the colloquial sense, versus as a matter of a guideline. And under 3553A, wouldn't that be perfectly appropriate to consider? It would. Yet, again, some of this is obviously not revealed to us by the judges. I'm starting my position here because the guidelines are here. But I think from a defense perspective, that's how we approach cases. We seek to push down on the guidelines as hard as we can in our district, and then talk about how the guidelines simply overstate what's a necessary sentence in this case. Or understate, in this case, if you're right about the kind of hermetically sealed analysis of first status and then conduct under the breach of trust adjustment. Three circuits have discussed this conflation and have distinguished the notion of trust in the colloquial or conventional sense versus as should be applied or not in 3B1.3. And I believe that Kitt's position was certainly the former and not the latter. And because of Judge Hamilton, you raised this, I'm going to talk briefly about the court's findings. The district judge in this case, in five sentences, essentially dispatched with my arguments in 158 words and made very few findings. The court found that Andis was not General Motors or General Electric, but a very, very close-knit family business. The court found that Betty Kitt was the lead materials processor. I don't know why I said processor versus handler, essentially the same thing, I guess. And he also said that she had the discretion to assign to others. He didn't say assign to what. And then he just engaged in some conclusions. He said, there is nothing in the record to suggest that she, independent of anyone else, purloined all the materials that were stolen or shipped through Andis. There actually was a co-defendant who participated in this as well. And so he said he was constrained to occur on the basis of the underlying operative facts, but he really didn't talk about the underlying operative facts. So what did Ms. Kitt do in that job? What she did was essentially a task within the shipping department. She received an order that she had no involvement in obtaining, a customer order. That order had a number because of the system. She took that order. She made sure that the appropriate products were placed in the appropriate boxes, and she created a shipping label and sent it out. Each task, a discrete task, she had no managerial discretion whatsoever. And that's not simply what the guideline talks about, but also case law. 3B1.3 talks about that type of a position is characterized by professional and managerial discretion. And in this court's cases, some of the characteristics, Bradshaw talks about a defendant's authority over the victim's valuables and the degree of discretion given to the defendant by the victim. Fuchs, F-U-C-K-S, talks about how a defendant's ability to access or control the victim's valuables don't always trigger an increase. And I think that's important here because I've given the warehouse example. A warehouse worker theoretically could have done what she did, figured out perhaps a spot where security cameras could not be seen, stored supplies for a little bit, and walked out with them. And that is essentially what she did, just with slightly more sophisticated means. Well, just right there, because it seems to me that when you said what she methodically does as a routine, you know, it sounds simple and et cetera. But in order to saddle to that or combine it, I don't get it. I don't know what she did that was able to get away with it for this length of time for that amount of money. So it had to be something that only a formula or something that she created and got away with it for all that time. That goes to the second part of the question, whether her position of trust significantly contributed to her crime. And I'm obviously concentrating most of my argument on the first, whether she occupied such a position. Well, I guess I can't have one without the other. Well, I'm going to try to answer that in a minute, or a couple of us in a minute. She realized that she could create another UPS label that wouldn't be picked up by the system. And even though her creation of UPS labels was monitored by security cameras, for whatever reason, they didn't figure that out until January of 2017. Unless there are other questions that I have one minute for rebuttal. All right. Mr. Campion, thank you very much. For the United States, Ms. Monfields. Good afternoon. May it please the Court. My name is Elizabeth Monfields, and I represent the United States in Ms. Kidd's appeal. The real ultimate question here is whether Ms. Kidd occupied a position of trust. And I think that the evidence in this case really does not support Ms. Kidd's very narrow vision of her position with respect to her employment at Andis. The record is clear that Ms. Kidd possessed the control to assign other employees to various tasks and various workstations among the warehouse as the lead materials handler. So she oversaw other materials handlers. In her letter to the Court, she also recognized that she trained other individuals. And to the point where she had the ability to assign others to various workstations, she could also assign herself to various workstations to allow her to accomplish any aspect of this scheme on any given day. So, in essence, Andis gave Ms. Kidd the autonomy to accomplish her job as the lead materials handler, and I think the autonomy is an embodiment of this position of trust that Andis entrusted Ms. Kidd with the professional and managerial discretion to... So, what's the professional discretion? The professional discretion is to... Ordinarily, we're talking there about lawyers, accountants, investment advisors, fiduciaries, right? Correct, Your Honor. So let's talk about managerial discretion. So, in this Court's opinion in Tio Yanko, Judge Evans wrote for the Court, what makes all of the jobs in both of these categories similar, though our cases have not always stated it explicitly, is that they involve the type of complex, situation-specific decision-making that is given considerable deference precisely because it cannot be dictated entirely by or monitored against established protocol. Hard to see that here, I've got to say. Your Honor, so the government would agree that Ms. Kidd was not given discretion to fulfill her legitimate functions. So, like in the case, the Peterson-Knox case, that employee was given discretion to order equipment on behalf of the employees of the company. She was not given discretion to order surplus computers, which then caused other people in the company to... The parties in Peterson-Knox agreed that this enhancement applied, correct? That's correct, Your Honor. So that doesn't really tell us a whole lot. Well, the Court did go on to say in that case that because the employee was unable to create and destroy shipping labels that were used in furtherance of the scheme, she violated her position by taking advantage of the discretion that was given to her. So, in that respect, this case is very similar because they were acting within their job description, so to speak. It sounds like that's reasoning that would apply to any fraud scheme or theft scheme that an employee manages to conceal for more than a very short period of time. They're given enough of a loose enough rein that they can avoid getting caught for a while. And yet, those are harms that are generally caught up by other guideline features. Your Honor, this case is very distinct in the fact that when Andis discovered that there were these inventory shortages, they turned to Ms. Kidd as a 20-year employee for their company, whom they entrusted with the discretion to carry out the goals of the shipping department. And they turned to her to help uncover these sorts of errors. Discretion to carry out the goals of the shipping department, I assume means fulfill ship orders, right? Correct, Your Honor. So, she didn't have the discretion, if there was something that came through in the system, to generate the shipping labels. That's what she did. But she also, to effectuate her scheme in this case, would have certain... The record doesn't seem to be clear whether she picked the materials or had another employee pick the materials. But somebody had to create an additional shipping label to legitimate orders so that these non-legitimate orders would be sent out as adjuncts to the legitimate orders. And so, Andis was entrusting her to carry out her function with integrity and with honesty, and she did not do that in this case. That would apply to every bank teller, right? I would agree, yes, Your Honor. And yet, 3B1.3 does not apply to every bank teller, right? That is correct. So, help us distinguish. Yes. So, I think that the example given is, well, let's assume there's a warehouse worker, and Ms. Kidd is just simply going into the warehouse and picking materials off the shelves, putting them in her bag, and walking off with them. That would be similar to maybe a bank teller digging into the till, taking cash out, and walking out with it. In those instances, there would be any employee at Andis that could do that. In this very case, Ms. Edmondson, co-defined in this case, could not accomplish this criminal scheme without Ms. Kidd. She needed to go to Ms. Kidd for Ms. Kidd to generate these illegitimate shipping labels, which thereby caused Andis products to be shipped out against the goals of the shipping department. So, I think that illustrates that, in this case, Ms. Kidd's position is elevated beyond the ordinary degree of reliance and integrity that would be given or would be expected of any employee of any company, for that matter. Does Ms. Kidd have direct reports? Your Honor, I'm not sure that that's clear in the record. I think that there's nothing in the record that demonstrates that anybody had direct supervisory authority over her. No. No, that she had direct supervisory authority over. That she had direct... Who would have reported to her. Well, she had authority over the material handlers. The record is clear insofar that she had the control to assign them to workstations, to give them tasks, but the record is not clear about whether those material handlers reported to her, other than her statements in her letter saying that she did train other individuals. So, Andis finds out there's inventory shortages. Andis comes to Ms. Kidd, says, what's going on here? Link up with the FBI. How does that happen? Well, they turned to Ms. Kidd to help figure out what was going on with the inventory shortages. So, I think that's clear in the case law. Many cases say that in this case there was no oversight that could catch her crime, so to speak. But that does not demonstrate that there was any lax supervision in this record. So, to your Honor's point, what had happened was that they noticed there was an inventory shortage. A customer called up and said they never got their order. When they actually checked the UPS labels, which they use, and it's part of a separate system, they noticed that the UPS system did not match what their order system, in effect, said. So, then they noticed all these individuals that under Andis books were non-customers. And at that point is when FBI got involved after they had set up a situation where they could then go back and look at the camera to see who applied the shipping label for this one particular package. Which found out that it was Ms. Kidd, and then that's how the FBI got involved. I had another question about the loss calculation here. I know that hasn't been debated, but I have to say this loss calculation looked very conservative to me. But the number that was used was, in essence, cost of production of the stolen items. Is that right? That's right, Your Honor. It's cost of production as well as the shipping costs that were also generated. Out-of-pocket. Out-of-pocket, yes. No profit. Well, when a high-end company has its goods diverted into a black or gray market, the harm to the company's goodwill with the customers who are willing to pay for the premium product is enormous. And none of that's accounted for here. That's correct, Your Honor. I think with respect to a certain time period, there were just simply not enough records that remained at Andis that allowed them to legitimately come up with a number that maybe would be more in line with the actual loss of the company. The point I'm making is that for purposes of 3553A, if we were to remand this, either the district judge or another district judge might take a different view of this, keeping in mind we've got a below-guideline sentence here. Also, though, Ms. Monfils, I'd be interested to know, I mean, I raise questions about whether this error might be harmless under those circumstances if it was indeed an error. But I was wondering if you could address the Supreme Court's recent decisions in Rosales-Morales, this year, and Molina-Martinez from two years ago, in which the Court said, in essence, a guideline error will be treated as a plain error in most circumstances so that it would require a remand for new sentencing, at least unless the judge has signaled very clearly that the guideline issue did not affect the ultimate sentence. Your Honor, I think that this, in terms of those Supreme Court decisions, whether this is plain error and then it should be sent back. No, this isn't plain error, because this issue was raised and debated. But those two cases say an awful lot about presuming consequences from guideline errors. Yes, Your Honor. I'm not sure if I understand your question quite clearly, but the position that I'm taking is that regardless of what standard we look at, there was no error here whatsoever. The district court... Indulge me with the assumption that we might disagree with that. Suppose that we do find a guideline error. Could we treat it as harmless in light of Rosales-Morales and Molina-Martinez? Your Honor, I am not extremely up to speed on the very particulars of that case. You don't need to answer the question then. Okay, thank you. Thank you, Your Honor. Is there anything else you wanted to tell us? No, Your Honor. Thank you. Thank you. Go ahead and take two minutes, Mr. Campion. Thank you, Your Honor. In no particular order, I'm going to respond to the court's concern with regard to the loss calculation and sort of unstated losses. My recollection of the discussions or the sentencing arguments and the materials presented to the court did inform the court that these loss calculations were conservative and also that the goodwill loss was discussed in that local customers who heard about this said to Andis, hey, how come I'm not getting the good deal? So, respectfully, I think some of those facts that the court's concerned about were before Judge Stadmiller. I'm going to take some issue with what Ms. Montville said about no oversight that could have caught her crime. There was, in the record, we know that there were security cams, and that is indeed how they found the crime. And there's nothing in the record that I recall that those security cams were set up to catch her in this situation. I believe that existed as of at least November. I don't know. The record doesn't show when they were put in place. And this is a fine line, and I need to walk here as a defense counsel. Blame the victim. Bad thing to do. But Fuchs does talk about being subject to lax supervision alone does not convert one's job into a position of trust. And other circuits have addressed the same thing, and I talked about that in my reply brief. The court raised the issue of Tio Honko, or your court is saying it better than I can. I was going to call it Tio Janko. And that case has, of course, been adopted by other circuits. And the language that the court cited, Judge Hamblin cited, exactly goes to the point that she simply, Betty Kidd, simply did not occupy that type of position of trust. In the colloquial sense, yes, but not for purposes of 3B1.3. And in my district, I would like to have a remand to further discuss that. Thank you. Thank you to both counsel. The case is taken under advisement. And the court will stand in recess for, I believe, at least a couple of weeks now.